THE STATE OF FLORIDA ON THE RELATION OF Millard F. Caldwell, Governor, R. A. Gray, Secretary of State, J. Edwin Larson, Treasurer, Colin English, Superintendent of Public Instruction, and Nathan Mayo, Commissioner of Agriculture, who, together with J. Tom Watson, Attorney General, and J. M. Lee, Comptroller, constitute the Board of Commissioners of State Institutions of the State of Florida, and who, together with the said J. Tom Watson, Attorney General and J. M. Lee, Comptroller, constitute the Budget Commission of the State of Florida, v. J. M. LEE, as Comptroller of the State of Florida.

27 So. (2nd) 84                                         June Term, 1946
July 19, 1946                                                En Banc

774

*B. A. Meginniss,* for relators.

*J. Tom Watson,* Attorney General, *Fred M. Burns, Sumter Leitner, Howard S. Bailey,* Assistant Attorneys General, for respondent.

TERRELL, J.:

The Legislature of 1945 enacted Chapter 22820, the purpose of which was to (1) enable the State to provide or assist in. providing the necessary buildings and other facilities to meet the needs of its departments, agencies, and institutions, (2) enable the State to carry out a post-war program of conversion from war to peacetime economy, and (3) do the State's part toward relieving unemployment that usually follows the cessation of hostilities.

In order to carry out this program, Section 1 of the Act appropriated $3,000,000 and defined a tentative building program under groups A, B, and C, to guide the Board of Commissioners of State Institutions, but which it was authorized by the Act to change or modify within its discretion as the needs and circumstances of the agencies require.

To provide additional funds to complete this building program, Section 2 of Chapter 22820 provides:

" . . . the Budget Commission is hereby authorized and directed to examine into the funds of the State and funds and

appropriation balances of State departments, boards, commissions, institutions, and other State Agencies from time to time to ascertain what surplus or balance, if any, will remain in any of said funds after the needs of the State and its agencies are provided for without interfering with the operations thereof and their normal services to the public, or hindering the carrying out of all duties imposed by law and the efficient conduct of their business. When such ascertainment and determination shall have been made, the said Budget Commission, by and with the approval of the Governor, shall set aside timely for the purpose hereof such funds as the said Budget Commission may determine as unneeded balance or surplus, and shall cover the same into the State Building Fund to become a part thereof for use in providing suitable housing accommodations for such state agencies. Thereupon such moneys shall be and they are hereby appropriated to the purpose herein, available in like manner as moneys appropriated in Section 1."

Pursuant to authority vested in it, the Board of Commissioners of State Institutions projected a building program, which they estimate will cost in excess of $10,000,000; they have entered into contracts for units of its construction aggregating $5,456,668, which is far in excess of the $3,000,000 appropriated by the Act. To supplement this amount, the Budget Commission has, in compliance with Section 2, made an examination of the funds appropriated to the different departments, boards, commissions, and institutions, has ascertained and determined that there existed a surplus in the funds of several of said departments over and above their requirements, and, by and with the consent of the Governor, the said Budget Commission did adopt a resolution setting aside and transferring sums to the State Building Fund, as follows:

1. July 24, 1945, $1,500,000 from the General Revenue Fund.

2. July 24, 1945, $300,000 from the General Inspection Fund.

3. November 23, 1945, $40,753 from the incidental account of the Farm Colony, in General Revenue Fund.

4. February 26, 1946, $16,000 from the Agricultural Experiment Station account, in General Revenue Fund.

5. February 26, 1946, $97,988 from State Hospital Special Maintenance Account, in General Revenue Fund.

6. March 5, 1946, $2,000 from Agricultural Experiment Station account, in General Revenue Fund.

7. March 19, 1946, $2,000,000 from the General Revenue Fund.

The State Treasurer has, in compliance with the Resolutions of the Board of Commissioners of State Institutions, credited the sums so enumerated to the account of the State Building Fund, but the Comptroller has declined to set them up on his books as debited against the several accounts to the credit of the State Building Fund and has refused to recognize them as proper to draw warrants against, as contemplated by the Act. The Board of Commissioners of State Institutions allege that they cannot let contracts for additional buildings or secure lands therefor until said funds are transferred and made available for the State Building Fund in payment of obligations arising from their contracts to carry out this building program.

On petition of the Board of Commissioners of State Institutions and the Budget Commission, alternative writ of mandamus was directed by this Court to the Comptroller, commanding him to account for the sums named in said resolutions and quoted herein and set them up on his books as debited against the several accounts enumerated in the resolution as credited to the State Building Fund, subject to warrants on vouchers to pay for public buildings, facilities, and sites, as contemplated by Chapter 22820. The cause is before us for determination on a motion to quash, a return to the alternative writ, and a motion for peremptory writ notwithstanding the return.

The first question with which we are confronted challenges the constitutional validity of Chapter 22820, Acts of 1945.

Respondent insists on a literal application of Section 1 of said Act, insofar as it relates to the building program. He contends, in other words, that the buildings and facilities with

prices following them, indicated in groups A, B, and C, must be contracted for and constructed as the Act directs and not otherwise. We do not so construe the Act. We think that Section 1 contemplates a wide latitude of discretion on the part of the Board of Commissioners of State Institutions. Groups A, B, and C, and the figures thereafter, are mere estimates. The Board of Commissioners of State Institutions were expected to use it as a guide but could bend or modify it as they saw fit to accomplish the general legislative purpose. The actual construction and costs had to be determined from enginers' and architects' plans and specifications.

The point is also made that the Act is bad because of indefiniteness of the amount appropriated, but we find no support for this contention. The Legislature outlined a general building policy for the triple purposes defined in the Act. It made a flat appropriation of $3,000,000 and when appropriated such other sums as the Budget Commission found to be unneeded balances in the different funds, subject to transfer to the State Building Fund as provided in Section 2 of the Act. The program is limited to ten years, and the appropriation is limited both by the unneeded balances and by the amounts found to be necessary by architects and engineers to carry out the building program. It was subject to audit and change at each successive session of the Legislature.

In a public project the magnitude of this, it would hardly be possible to give a detailed specification for items of expenditure in the authorization with prices fluctuating as they are now. Some discretion must be vested in those who execute large plans for public benefit, and we think ample safeguards have been thrown around this one. So long as it is for a lawful purpose, the Legislature has absolute power over the public purse. The purpose of the expenditure in this case is not challenged; the assault is directed solely at the manner in which it is undertaken. The case of Carlton et al. v. Matthews, 103 Fla. 301, 137 So. 815, and cases therein cited, is a complete answer to this contention.

It is next contended that the quoted provisions of Section 2, Chapter 22820, authorizing the Budget Commission to ascertain surpluses in the several State funds and, with the ap-

proval of the Governor, order them transferred to the State Building Fund, constitutes an unlawful delegation of legislative power.

There is no line demarking legislative, executive, and judicial powers in our scheme of constitutional government, though it is well known that in many instances these powers overlap. The quoted part of Section 2 authorizes the Budget Commission to examine the funds of departments, boards, commissions, institutions, and other State agencies and ascertain any surpluses or balances they may have on hand after their required services to the public have been performed. If any unneeded balances are found to exist, the Budget Commission, with the approval of the Governor, may transfer them to the State Building Fund to be used in executing the building program promulgated by the Act.

The Budget Commission's power is limited, as a fact, to finding whether or not such balances exist; the Act appropriates them and makes them available in like manner as moneys appropriated in Section 1. We do not consider this an exercise of legislative power by the Budget Commission. Appropriations have frequently been made contingent on an audit or the findings of an administrative board and have been upheld. Carlton v. Matthews, supra; Duke Power Company v. Greenwood County, 91 Fed. (2) 665, affirmed in 82 L. Ed. 381 and 16 C. J. S. 378. Both Federal and State governments have frequently indulged such delegations of power, and many millions of dollars have been allocated and used for public projects in the manner authorized here.

It is next contended that, even though Section 2 of Chapter 22820 is permissible as to balances in the various State agencies, it has no application to special funds described in Section 3 of Chapter 22827, Acts of 1945.

Chapter 22827 is better known as the General Appropriations Act. Section 3 has to do with the handling of such funds as come into the hands of the State Board of Control and the Board of Commissioners of State Institutions from projects administered by them. It is not in conflict with Chapter 22820. We think the Board of Commissioners of State Institutions may, in their discretion, subject these funds to the

balances in question when they are not needed for current improvements or have not been appropriated to some contract of the board receiving them. This conclusion is fortified by Section 11 of Chapter 22857, which should be read in pari materia with Chapter 22820 and Chapter 22827. No balance can be intelligently determined without an analysis of these acts and other factors hereafter mentioned.

Chapter 22857 amends certain provisions of the Budget Commission Act, which completely revised the method of legislative appropriations for the different departments, boards, commissions, institutions, and other State agencies. The Budget Commission is of the same personnel as the Board of Commissioners of State Institutions; they are elective, constitutional, State officers and are clothed with very broad powers. A reading of these three Acts with the objective to be accomplished by Chapter 22820 will aid materially in removing the controverted difference raised in this case. The facilities authorized by the latter Act extend to all State agencies, and it was designed to provide them in the most expeditious manner possible.

Section 23, Article 4 of the Constitution provides that the Comptroller shall examine, audit, adjust, and settle the accounts of all officers of the State and perform such other duties as may be prescribed by law. Pursuant to authority claimed under this provision, the Comptroller contends that items 3 and 5, quoted elsewhere in this opinion, are not subject to transfer to the State Building Fund because, under Section 3 of Chapter 22827, they are appropriated to the Farm Colony and the State Hospital. A similar objection is raised to the transfer of Items 4 and 6.

The duties of the Comptroller as a member of the Budget Commission fall in the category of "such other duties as may be prescribed by law." From the schedule of improvements recited in the Act, it will be seen that major additions to the Farm Colony and the State Hospital are contemplated. It may be that contracts for repairs and necessary improvements at these institutions have been let and are underway. If this is the case, such funds in these items as are not necessary for these improvements are subject to be included in bal-

ances for transfer to the State Building Fund. If there are no contracts out for repairs and necessary improvements, the Board of Commissioners of State Institutions may consider these funds in determining balances, as provided by Section 2.

As to Items 1 and 7 embraced in the Budget Commission's order of transfer, the Comptroller contends that there was no surplus in the General Revenue Fund on May 14, 1945, subject to transfer to the State Building Fund. From this, it appears that the real point at issue is a difference between the parties hereto as to when a balance in any fund arises that is subject to transfer, when it should be designated, and what means should be employed to determine when it exists.

Section 2 makes no requirement as to the time and procedure the Budget Commission shall adopt in determining when balances in any fund exist or when such balances shall be transferred to the State Building Fund. The sole limitation on the Budget Commission is that such balances and transfers shall not interfere with the agencies of the State in the performance of their normal services to the public or hinder them in executing the duties imposed on them by law. There must, of course, be an actual balance found to exist, and the Budget Commission should be as careful to preserve legal requirements of the State agencies as it is to press the building program.

In determining when a balance in any fund or in all funds exists, many elements are required to be considered. If done at the end of the fiscal year or thereabouts, it would be much simpler, because it would involve primarily a balancing of appropriations and expenditures with amounts collected. Appropriations for the support of the various sending agencies are made on the basis of work programs and allotments required under Section 11 of Chapter 22857, Acts of 1945. All the income and expenditure factors mentioned here would enter into the picture when determining whether or not a balance exists in any fund. Then the Board of Commissioners of State Institutions is clothed with the responsibility of maintaining the State Hospital at Chattahoochee, the State Prison Farm, the home for the epileptic and feeble-minded, and others. These require large sums constantly. From De-

cember to June is the period in which the major portion of the funds come into the treasury; the summer and fall is the lean tax collection period. All these factors and others enter into the matter of determining when a balance in any or all funds exists. This is particularly true if the balance is sought at any time other than at the end of the fiscal year.

In view of the elements affecting it the law vests in the Budget Commission a very broad discretion to determine when and how a balance in any or all funds shall be determined. We think they may be determined any time during the fiscal year. The Comptroller is a member of the Budget Commission and participates in this determination. The action of the majority controls, and, when the majority has determined the matter, it is his duty to acquiesce, regardless of how he feels personally, unless he has a well-settled conviction that fraud or illegality controlled the majority action. The mere fact that he has a different idea about how the balance should have been arrived at is no reason for refusing to set up and transfer the account on his books.

The test to determine when a balance in any fund exists is whether or not it has a surplus after deducting such sums as will be required to perform its legal functions for the rest of the fiscal year. It is certain that the Legislature did not intend that the normal functions of an agency should be hampered. If this determination is made at the end of the fiscal year, it is not so difficult, but, made at any other time, it becomes more difficult because of the different factors that affect the determination. Since this determination involves a field in which the Comptroller is conversant and with which he is called on to deal frequently, his judgment should weigh heavily, but the responsibility is on the Commission, and the judgment of the majority is controlling when exercised within the statute.

It is not amiss at this point to call attention to the two provisos attached to Section 2 of the Act. The first provides, in effect, that, if an emergency arises in any department by which it becomes embarrassed after a balance is found and a transfer is made, the Budget Commission may withdraw such funds as it may deem advisable from the State Building Fund

and restore them to the credit of the department from which they were transferred, provided the restoration does not exceed the funds withdrawn in the first instance. The second proviso has relation to funds appropriated to match Federal funds, funds in the hands of the State Board of Health, the Board of Control, and other boards, and appropriations for contractual purposes that would be adversely affected by setting aside balances from them. As to such funds, they should not be included when ascertaining balances, but it is not unlawful, to use the funds so raised to assist in securing the buildings or facilities constructed by the appropriations first mentioned. The second proviso contains the further limitation to the effect that funds raised from balances under this section shall be appropriated, so far as practical, so that the agency from which funds are drawn shall be benefitted by them.

We are not convinced that the motion to quash or the return offers any defense to the alternative writ, so the motion for peremptory writ notwithstanding the return is granted.

It is so ordered.

CHAPMAN, C. J., BROWN, BUFORD, THOMAS, and SEBRING, JJ., concur.

ADAMS, J., not participating.