### 17704

T. Lewis COX, individually and as a taxpayer on behalf of himself and and all others, similarly situated, too numerous to mention, who may join and share in the benefits and burdens of this action, Plaintiff, v. Jeff B. BATES, as Treasurer of the State of South Carolina, and E. C. Rhodes, as Comptroller General of the State of South Carolina, Defendants.

(116 S. E. (2d) 828)

*Messrs. E. W. Johnson,* of Spartanburg, *Alfred F. Burgess,* of Greenville, *Dorcey Lybrand,* of Aiken, *Hugh L. Willcox,* of Florence, *Frank H. Bailey,* of Charleston, *for Plaintiff,*

202

*Messrs. Daniel R. McLeod, Attorney General,* and *James S. Verner* and *Julian L. Johnson, Assistant Attorneys General,* of Columbia, and *Sinkler, Gibbs & Simons,* of Charleston, *of Counsel, for Defendants,*

*Messrs. E. W. Johnson,* of Spartanburg, *Alfred F. Burgess,* of Greenville, *Dorcey Lybrand,* of Aiken, *Hugh L. Willcox,* of Florence, and *Frank H. Bailey,* of Charleston, *for Plaintiff, in Reply,*

October 19, 1960.

STUKES, Chief Justice.

In this action in the original jurisdiction of the Court plaintiff attacks as unconstitutional the law providing for the creation and maintenance of a State reserve fund and for the distribution of surplus funds to the counties for public school purposes.

Sections 2 and 3 of the Permanent Provisions, Part III, of the State Appropriation Act of 1954, 48 Stat., at pages 1676, 1677, follow:

"Section 2.   General Fund Reserve Account created.—There shall be established and maintained a fund which shall hereafter be carried in a special account in the State Treasury, and which shall be known and designated as 'The General Fund Reserve.' The maximum amount of the General Fund Reserve shall be $3,000,000.00.

"On or before September 30, 1954, and of each year thereafter, the State Budget and Control Board shall determine the amount by which the State's revenues, applicable thereto, exceeded the sum of (1) actual expenditures for normal maintenance and operation of the State Government for the fiscal year immediately preceding, including expenditures to political subdivisions of the State based on established percentages of revenues, but not including expenditures for highway purposes, and (2) unexpended balances of continuing appropriations made during the fiscal year immediately preceding. From such excess revenues so determined, if any, there shall be transferred to the General Fund Reserve an amount sufficient to bring the said General Fund Reserve to the sum of $3,000,000.00, but not in excess thereof.

"The General Fund Reserve shall be used, by transfer to the State's General Fund, as directed by the State Budget and Control Board, to cover, or apply to, any annual deficit which may occur by reason of General Fund expenditures in any year, plus other outstanding appropriation liabilities, exceeding revenues applicable thereto, and for no other purpose.

"Section 3.   Budget and Control Board to make certain determinations—excess revenues to counties.—On or before September 30, 1954, and of each year thereafter, the State Budget and Control Board shall determine the amount by which the State's revenues, applicable thereto, exceeded the sum of (1) actual expenditures for normal maintenance and operation of the State Government during the next preceding fiscal year, including expenditures to the political subdivisions of the State based on established percentages of revenues, but not including expenditures for highway pur-

poses, (2) unexpended balances of continuing appropriations outstanding at the end of the preceding fiscal year, and (3) whatever amount is found necessary to bring the General Fund Reserve to the prescribed maximum amount.

"All excess revenues so determined are hereby appropriated annually to the counties of the State, to be distributed to the respective counties in the proportion that the pupil enrollment of the public schools of a county bears to the total public school enrollment of the State, as determined by the State Superintendent of Education for the preceding school year. Such funds shall be used for General Public School purposes, including the payment of school debt, *as directed by a majority of the respective legislative delegations, including the senator.*" (Emphasis added.)

The foregoing enactment was amended by Section 14 of Act No. 333 of 1959, 51 Stat., at pages 617, 618, as follows:

"Notwithstanding the provisions of Section 2, of Part III, of Act No. 644 of the Acts of 1954, on or before September 30, 1960, the State Budget and Control Board shall determine: (1) the actual cost of operation of the State government for the preceding fiscal year; (2) any appropriation liabilities of that year which may be outstanding and unpaid at the time, and (3) any General Fund deficit which may have existed at the beginning of the said fiscal year.

"If it shall be found that the State's General Fund revenue collections for that year exceeded the total of its operating cost and the liabilities enumerated above by the amount of $1,500,000.00, there shall be paid to the respective counties of the State for maintenance and operation of public schools, all such excess above the $1,500,000.00 up to the sum of $1,500,000.00 to be distributed among the counties on the basis of pupil enrollment as now used for other funds allotted for this purpose.

"Thereafter, if further excess funds remain, the General Fund Reserve shall be built up to the statutory amount, and

any remaining excess funds shall be distributed to the counties as now provided by statute."

The latter Act, of 1959, was repealed and the Act of 1954 amended by Section 18 of the Permanent Provisions of the State Appropriation Act of 1960, 51 Stat., Second Part, at page 1901, as follows:

"Notwithstanding the provisions of Section 2, of Part III of Act No. 644, Acts of 1954, the General Fund Reserve to be set aside at the end of the Fiscal Years 1959-60 and 1960-61 shall be $5,000,000.00.

"Section 14 of Act No. 333 of the Acts of 1959, is hereby repealed."

Plaintiff's attack upon the constitutionality of the law is manifold. His points will be discussed and disposed of in the order in which they are presented in the brief. The first is that the above emphasized provision of the Act of 1954, which provides for the expenditure of the funds under the direction of the respective county legislative delegations, violates Section 14 of Article 1 of the Constitution of 1895 which requires the separation of the powers of the several branches of the government and prohibits the exercise of the functions of one of the departments by a member of another department. Defendants concede the point and that the provision of the statute objected to should be stricken, under the authority of *Dean v. Timmerman,* 234 S. C. 35, 106 S. E. (2d) 665, and the earlier decisions there cited. However, they assert that the Act is complete and valid despite the deletion and is capable of enforcement without it. That was the result in the *Dean case* and we think clearly should be here. The problem was presented in *Parker v. Bates,* 216 S. C. 52, 56 S. E. (2d) 723, and discussed at great length. That case involved a distribution of State surplus funds to the counties for hospital and other public health purposes; here it is for public school purposes. The authorities cited in that case relating to the severability of the Act and the validity of the remainder of it after elimina-

tion of the unconstitutional portion are applicable here and need not be so soon repeated. The unimportance of the absence of a severability clause was also demonstrated in that case and need not be repeated.

There is here this further consideration which is conclusive of the legislative intention. The amendments of the law in 1959, *supra,* and in 1960, also *supra,* were after the decision of *Dean v. Timmerman, supra,* from which latter it was plain that the objectionable provision in the law for expenditure of the funds under the direction of the county legislative delegations was unconstitutional and invalid. The members of the General Assembly were charged with, and in this instance doubtless actually had, that knowledge and they deliberately twice reconsidered and retained the law, which is convincing that it was the legislative intent that the law should remain in force without the invalid provision. *State of Missouri v. Ross,* 299 U. S. 72, 57 S. Ct. 60, 81 L. Ed. 46.

The funds will be administered and disbursed in the counties by their respective proper authorities for "General Public School purposes, including the payment of school debt", which latter are the terms of the statute and the legislative object of the appropriation. It is presumed that the county authorities will observe the law. *Parker v. Bates, supra.* Plaintiff says in his brief, folio 16, that, quoting, "Some * * * might decide to use the funds for payment of teachers' salaries, some for the payment of the cost of maintaining buildings, some for new schools and some for payment of school debts." But surely all of these are "General Public School purposes" and within the terms of the statute.

In the consideration of the foregoing, and plaintiff's other positions whereby he would have the law adjudged to be unconstitutional, there must be kept in mind these truisms which have been many times enunciated and applied: The supreme legislative power of the

State is vested in the General Assembly; the provisions of our State Constitution are not a grant but a limitation of legislative power, so that the General Assembly may enact any law not expressly, or by clear implication, prohibited by the State or Federal Constitution; a statute will, if possible, be construed so as to render it valid; every presumption will be made in favor of the constitutionality of a legislative enactment; and a statute will be declared unconstitutional only when its invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution. *Santee Mills et al. v. Query et al.,* 122 S. C. 158, 115 S. E. 202; *Clarke v. South Carolina Public Service Authority et al.,* 177 S. C. 427, 181 S. E. 481; *Ellerbe v. David et al.,* 193 S. C. 332, 8 S. E. 2d 518; *Pickelsimer v. Pratt et al.,* 198 S. C. 225, 17 S. E. 2d 524; *Moseley v., Welch,* 209 S. C. 19, 39 S. E. 2d 133; *Gaud v. Walker,* 214 S. C. 451, 53 S. E. 2d 316, and *Parker v. Bates, supra.*

Plaintiff's second point is that the law is violative of Sec. 2, Art. X, of the Constitution, which follows:

"The General Assembly shall provide for an annual tax sufficient to defray the estimated expenses of the State for each year, and whenever it shall happen that the ordinary expenses of the State for any year shall exceed the income of the State for such year the General Assembly shall provide for levying a tax for the ensuing year sufficient, with other sources of income, to pay the deficiency of the preceding year together with the estimated expenses of the ensuing year."

It is contended that this provision (1) forbids the creation of a surplus (reserve fund) and (2) forbids the appropriation of a surplus to the counties, as here.

With reference to (1), the very simple answer is that the quoted constitutional provision contains no prohibition of a surplus; on the contrary, it deals with a deficit and requires the levy of taxes to meet such. It was analyzed in *Pickelsimer v. Pratt, supra,* 198 S. C. 225, 17 S. E. 2d 524, 528, as fol-

lows: "It is obvious that this constitutional provision is designed to prevent the General Assembly from failing to levy taxes equal in amount to the appropriations made. Unless this were done, the state's credit woul be jeopardized and its ordinary governmental functions curtailed or seriously impaired." In that case, opinion by Mr. Justice Oxner, then a circuit judge, similar contention against the accumulation of a surplus was rejected. See in accord, *State ex rel. Caldwell v. Lee,* 157 Fla. 773, 27 So. 2d 84.

The occurrence of a surplus (or deficit) is fortuitous and results from the variations of the prospective estimates and the subsequent actual receipts of state revenues. It appears from the figures in defendants' brief that during the last seven fiscal years the receipts have exceeded the estimates during four years and have fallen below the estimates during three. For the fiscal year 1957-58 the receipts were over $3,000,000 less than the estimates. In 1958-59 the receipts exceeded the estimate by almost $5,000,000, and for 1959-60 the receipts exceeded the estimates by $8,656,000. When the constitution was adopted the principal source of state revenue was property taxes; the assessment was known and a fixed millage would yield a certain amount. Now the state levies no property tax and depends upon income taxes, sales taxes and the like, the yields of which vary with economic conditions and are impossible to forecast with accuracy. *Lott v. Blackwood,* 166 S. C. 58, 164 S. E. 439. The inevitable result is that at the end of some fiscal years there occur deficits and in others surpluses. It would appear the part of wisdom and prudence to try to provide a cushion fund from any surplus to offset a future deficit, which is the plain legislative purpose as expressed in the act of 1954, supra, and the amount of $5,000,000 cannot be said to be unreasonable as a matter of law in view of the total state appropriation of about $180,000,000, exclusive of disbursements for highway purposes. The act followed the recommendation on Feb. 10, 1954, of the Governor's Tax Advisory Committee, composed of outstanding citizens and businessmen, as follows:

"If, due to a decline in general business conditions, tax revenues in this state decline and expenditures are not reduced accordingly, the state will be confronted with a serious difficulty in finding sources from which to make up the difference. Such a situation may develop in the next year or two. In any event, sound fiscal policy demands that surplus funds in the State Treasury arising from income in excess of expenditures in recent years should be earmarked to take care of budget deficits in the years ahead. Such deficits may arise sooner than we think."

Does the foregoing constitutional provision prohibit this practice? We do not think so.

Section 3 of article IX of the Constitution of 1868 was identical. It was under construction in *State v. Hayne,* 4 S. C. 403, where it was contended that the effect of it was to deny to the General Assembly the power to levy an occupational license tax. The meaning of the section was discussed at great and illuminating length and it was concluded that its purpose was to require that the ordinary expenses of the State should be met from year to year and paid from annual income and that public debt should not be created for the purpose of liquidating ordinary expenses; occupational licenses taxes are not forbidden by it. By parity of reasoning we conclude that the corresponding section of the present constitution contains no bar to a reserve fund in reasonable amount, such as is that contemplated, indeed limited, by the law before us. It undertakes "to pay the deficiency of the preceding year," the words of the constitution by, in effect, preventing the occurrence of a deficiency. The foregoing conclusion of the Court in the *Hayne case* was premised upon the consideration that the full and complete legislative power is vested in the General Assembly, including that of taxation except as limited by other provisions of the constitution; and Sec. 2 of Art. X is not a limitation. For recent reaffirmation of this rule, see *State ex rel. Roddey v. Byrnes,* 219 S. C. 485, 66 S. E. (2d) 33.

*State ex rel. Branch v. Leaphart,* 11 S. C. 458, was a proceeding in mandamus to require the treasurer to pay certain claims against the State. The concurring opinion of Mr. Justice Haskell, one of the majority of the court, is enlightening. It appears that an appropriation by the General Assembly for a stated object was not exhausted during the fiscal year. The remaining unexpended balance was said to be an unappropriated sum lying over to the credit of the State. It was said: "In this case the levy was made, the condition was executed in part, and it was not impossible that it may have been executed as to the whole, within the fiscal year. There are no words in the act directly or indirectly extending the operation of the act beyond the fiscal year. The court is obliged to presume that the act meant what in law it ought to mean, there being no words to the contrary. The operation of the act being thus confined to the fiscal year, the 'object' has been accomplished. So much of the money as 'may be necessary' has been or is ready to be applied to such interest demands as were settled by the adjudication of the said court of claims within the fiscal year, and the rest is an unexpended balance which reverted at the expiration of the fiscal year to furnish, with the levy and money derived from other sources of income, the fund to meet the ordinary expenses of the ensuing year, including deficiencies coming over from the last. Such is the practice, and such we think is the law made by the constitution. For instance, take the appropriation made by the fourteenth section of the same act of March 22d, 1878, page 526, 'that the sum of $7-500.00, if so much be necessary, be, and the same is hereby appropriated to pay the salaries, clerk hire, and the expenses of the commission elected at this session of the general assembly to codify the laws, etc.' Suppose, as I believe was the case, that no commission was elected at that session. The object of the levy and of the appropriation was plainly stated, and the money could not be applied during that fiscal year to any other purpose, but was held by the state treasurer under the appropriation caption in his books. It there re-

mained until the end of the fiscal year. The object certainly was legal; indeed it is one directed by the constitution itself —article V., Section 3. But it is hard to conceive that the money thus appropriated must be (remain?) in the treasury until in some subsequent year provision may be made to revise and codify the laws, and then the money be applied. I see no real difference between that instance and the one now in hand." Likwise here the existence of a surplus at the end of the fiscal year was uncertain, made so by the variations in annual receipts from the various tax sources of the state and the inevitable differences, sometimes plus and sometimes minus, between the prior estimates and the actual yields. The General Assembly went further than in the *Leaphart case* and set aside a certain amount of the possible surplus as a reserve fund against future deficits and appropriated any additional surplus to the counties for school purposes. While it is a continuing appropriation in terms, it is subject to future legislative repeal, which is expressly recognized in plaintiff's brief, folio 170. Therefore plaintiff and others so minded may seek at the ballot box remedy for what they consider to be a wrong. Much of his argument here is, wittingly or not, concerned with legislative policy, with which the court has nothing to do. *State ex rel. Railroad Co. v. Whitesides,* 30 S. C. 579, 9 S. E. 661, 3 L. R. A. 777.

We find no provision of the constitution which prohibits continuing appropriations, which are subject to repeal by any future General Assembly, as has been said. *Pickelsimer v. Pratt, supra. Briggs v. Greenville County* and *Grimball v. Beattie,* both *infra.* Plaintiff cites, as contrary, the Nebraska decisions, *State ex rel. Norfolk Beet-Sugar Co. v. Moore,* 50 Neb. 88, 69 N. W. 373, and *Rein v. Johnson,* 149 Neb. 67, 30 N. W. (2d) 548, but from them it appears that the constitution of that State contains an express prohibition of continuing appropriations, which ours does not; and our decisions have uniformly upheld them.

With reference to the reserve fund, it is not an appropriation in the ordinary meaning of the word; it is to be set up and maintained from surplus funds if the latter are in hand at the end of the fiscal year, and held subject to meet any subsequent deficit. "The transfer to the general fund of the unused surplus of an appropriation is not an appropriation." 81 C. J. S. States § 164a, p. 1215. *People ex rel. Colorado State Hospital v. Armstrong,* 1939, 104 Colo. 238, 90 P. (2d) 522. *Nevada-California Electric Corp. v. Corbett,* D. C. N. D. Cal. 1938, 22 F. Supp. 951.

Turning to the appropriation to the counties for school purposes, we quote the following from *Briggs v. Greenville County,* 137 S. C. 288, 135 S. E. 153, 156: "The power of the Legislature over the matter of appropriations is plenary, except as restricted by the Constitution. 36 Cyc. 891. In the absence of a constitutional prohibition, the Legislature may make continuing appropriations; that is, those the payment of which is to be continued beyond the term or session of the Legislature by which they are made." (Citations.)

To the same effect is *Grimball v. Beattie,* 174 S. C. 422, 177 S. E. 668.

An earlier decision, which is cited and relied upon by the plaintiff here, was distinguished in the *Briggs case* as follows: "The petitioner maintains that in this state continuing appropriations are forbidden by section 2 of article 10 of the Constitution, as construed in *State v. State Warehouse Commission,* 92 S. C. 81, 75 S. E. 392, where the court held an appropriation for more than one year to be bad. That case is easily distinguished. There the General Assembly made an appropriation for expenditures of 1912 and 1913, and made no provision by taxation or otherwise for meeting the 1913 appropriation. In the present case, on the other hand, the Legislature has appropriated a special fund, and thereby complied with the requirement in section 2 of article 10 of the Constitution that the General Assembly shall 'pro-

vide for an annual tax sufficient to defray the estimated expenses of the state for each year.' "

It is presently similarly distinguishable. The appropriation to the counties is contingent upon the existence of a surplus in the State treasury. If and when it exists, it corresponds to the "special fund" of the *Briggs case*. However, the legislation is not in the nature of a contract and is subject to repeal by the General Assembly. Nor does it deal with the proceeds of taxes which were levied for an object yet unaccomplished, as in the gasoline tax diversion cases of *State ex rel. Edwards v. Osborne*, 193 S. C. 158, 7 S. E. (2d) 526, and *State ex rel. Edwards v. Osborne*, 195 S. C. 295, 11 S. E. (2d) 260. The statutes there concerned deficits, here a surplus. Rather, it is parallel to the situation in *Crawford v. Johnston*, 177 S. C. 399, 181 S. E. 476, 480, where it was said: "Finally, the objection is made that the act is in conflict with section 3 of article 10 of the constitution, which provides that 'no tax shall be levied except in pursuance of a law which shall distinctly state the object of the same; to which object the tax shall be applied.' We are not in agreement with this view. The provisions of the statute directing that certain revenues of taxes, levied and collected under existing laws, should be used in the payment of the bonds in the first instance, are not a re-enactment, as contended by the petitioner, of the tax referred to in section 2564 of the Code. No tax is 'levied' by the act before us, in the sense that word is used in the quoted section of the Constitution." See also, *State ex rel. Brown v. Bates*, 198 S. C. 430, 18 S. E. (2d) 346.

As we hold here, it is generally the law elsewhere that where a surplus remains after payment of appropriations, it may be appropriated to other purposes. 42 Am. Jur. 776, Public Funds, Sec. 80. Annotation Ann. Cas., 1917B, 867. *Parker v. Bates, supra,* is an example.

Plaintiff cites *Weyerhaeuser Timber Co. v. Roessler*, 1940, 2 Wash. (2d) 304, 97 P. (2d) 1070, 126 A. L. R.

882, which held that the commissioners of a county of that State were required by statute to take into account any existing surplus before fixing the tax levy for the year. It is patently irrelevant because the rather rigid statute controlled, and involved was a county, not a sovereign state. Counties, as arms of the state, are subject to control by the General Assembly. *Parker v. Bates, supra.*

Plaintiff's third point is that the above Act of 1954 does not conform with Section 23 of Art. IV of the constitution, which is:

"Bills appropriating money out of the Treasury shall specify the objects and purposes for which same are made, and appropriate to them respectively their several amounts in distinct items and Sections."

In the argument of this point reference is also made to section 3 of Article X, "No tax shall be levied except in pursuance of a law which shall distinctly state the object of the same; to which object the tax shall be applied." However, no tax is levied by the legislation under review. It is argued that the appropriation to the counties does not sufficiently specify the object and purpose of the appropriation; in other words, "General Public School purposes, including the payment of school debt," is insufficient. It is overlooked that the counties are but arms of the State, *Parker v. Bates, supra,* and that schools are a prime public purpose of the State. The clamor for more money for support of the schools is heard on every hand, even in the current presidential campaign. This State has long given substantial financial aid to the public schools, which are operated by counties and school districts. Something of that history is found in *Shelor v. Pace,* 151 S. C. 99, 148 S. E. 726.

In Article XI, Section 6, of the Constitution there was levied an annual poll tax, quoting, "the proceeds of which tax shall be expended for school purposes in the several school districts in which it is collected." Thus the framers of

the very constitution which plaintiff invokes themselves deemed "school purposes" a sufficiently distinct statement of the object of the tax and a sufficiently definite appropriation of the proceeds of the tax. What higher authority could be cited for the constitutionality in this respect of the presently questioned appropriation?

Under the designation "Aid to Subdivisions" very large sums of money are appropriated to the counties and municipalities by the State, all of which would appear to be invalid if this point of appellant were sustained. *Parker v. Bates, supra;* Sec. 67, Appropriation Act of 1960, 51 Stat. at pages 1875, 1876. The same observation is applicable to Sec. 68 of the Act, page 1876, "State Highway Department, for Operation, Maintenance and Construction, $55,039,000"; to Sec. 53, page 1853, "State Forestry Commission, Item 1, Division of forestry, Operation and Maintenance, $1,787,-880.00, Item 2, Division of State Parks, $369,746.00"; to Sec. 48, page 1848, "Insurance Commissioner's Office, Administration, $199,789.00; to Secs. 31, 32, 33 and 34, pages 1821-1822, State Hospital Pineland Training School, Whitten Village, and S. C. Sanatorium, all lump sum appropriations of $7,019,220.00, $425,339.00, $2,138,974.00 and $1,-148,572.00, respectively, designated "For Maintenance"; to Sec. 29, page 1819, State Department of Public Welfare, "Item 1, Administration $1,300,000.00", to Secs. 21 and 22, page 1811, the Opportunity School and the Agency of Vocational Rehabilitation, $164,926.00. "For Maintenance" and $400,000.00, undesignated, respectively; to Secs. 12, 13, 14, 15, 16, 17, 18 and 19, pages 1801-1803, which are lump sum appropriations for the State educational institutions, all in large, varying amounts designated merely, "For Maintenance"; to Secs. 39, 40, 41 and 42, pages 1826, 1827, the several State Industrial Schools, all lump sums "For Maintenance"; to Item 10 of Sec. 44, Board of Health, page 1841, which is "Aid to County Health Units," $1,111,689.00; and possibly to other appropriations which we have not enumerated.

In *Parker v. Bates, supra,* which is repeatedly cited herein because it is controlling of many of the issues, the appropriation to the counties was in the following language [216 S. C. 52, 56 S. E. (2d) 725] : "For use in: (a) the erection of hospitals and/or health centers and/or for matching grants by the Federal Government for the erection of hospital and/or health centers, (b) for the purpose of paying off existing bonds sold for the erection and/or equipping of hospital and/or health centers, (c) for operation of county hospitals and/or health centers, (d) for purchase of equipment and supplies for hospitals and/or health centers, (e) for hospitalization of indigent citizens, (f) for any other eleemosynary hospitals in said counties whether or not such hospital is a county or municipal owned institution, (g) or in the event any health center or hospital has been erected and/or equipped with county funds, the sums herein provided may be used as reimbursement to such county of costs of such erecting and equipping thereof." The propriety of it was not questioned by the able counsel who made vigorous constitutional attack upon other features of the act.

The title of the Act of 1954, 48 Stat. 1566, includes : "To Appropriate Funds From Surplus Revenues To A General Fund Reserve; For Additional School Aid To Counties Of The State * * *." The appropriation sections of the act, now questioned, are set forth hereinabove.

"The requirement of itemization is to be given a common sense construction, and the statement of a single appropriate general purpose may be sufficient, although there are many items, particularly where it is difficult to determine in advance the exact amount of each of the items." 81 C. J. S. States § 164d, p. 1218.

To this point plaintiff cites *Peabody v. Russel,* 1922, 302 Ill. 111, 134 N. E. 150, 151, 20 A. L. R. 972, where the appropriation held invalid under constitutional provision similar to ours was as follows :

"To the Department of Finance:

"For reserve ......................$500,000.00

"To be apportioned between the executive, judicial and military departments of the state government and allotted as emergencies arise by the director of finance with the approval in writing of the Governor." Laws Ill. 1921, p. 99.

The multiplicity and uncertainty of the possible objects of the appropriation are patent and it cannot reasonably be compared with that now before us. It was pointed out by the court that the appropriation lacked certainty as to the department of state by which it would be used, and was also wanting in a statement of the purpose of the appropriation. Moreover, it sought to delegate to an administrative officer the specification of its objects. Rather, the case *sub judice* falls within *Martens v. Brady,* 1914, 264 Ill. 178, 106 N. E. 266, 271, where it was held that an appropriation " 'for the purpose of building and maintaining state aid roads in the several counties of the state' " did not violate the foregoing constitutional provision in not specifying the amount for building roads in one item and the amount for maintaining them in another item. The court said: "The constitutional provision here invoked is one of importance and must be complied with in all appropriations to which it is applicable. Building roads and maintaining them when built are different undertakings, but both are necessary to carry out the general scheme or purpose of the act, which is to provide for better highways throughout the state."

A more recent Illinois case is to the same effect as the last cited. It is *Lund v. Horner,* 375 Ill. 303, 31 N. E. (2d) 611, 613, in which it was said: "The rule adopted in this State as to appropriations of this character, while recognizing the importance of the constitutional limitation upon appropriations, is that where the purpose for which the money is appropriated is single, as in the construction of a system of roads, the constitution does not require an itemization in detail of all expenditures of money in connection with the

general purpose for which the appropriation is made. It is pointed out that the General Assembly could not know at the time of making the required appropriation, even approximately, the amount required for each of the various contracts or purposes."

We think that the act under attack complies with Sec. 23 of Art. IV of the constitution by specifying the objects of the appropriations and making them in distinct items and sections, thereby subjecting them to separate vetoes by the Governor without affecting the validity of other appropriations contained in the act, which latter is the purpose of this feature of the constitutional provision. *Parker v. Bates, supra. Martens v. Brady, supra,* 264 Ill. 178, 106 N. E. 271. *Peadbody v. Russel,* 302 Ill. 111, 134 N. E. 150, 151, 20 A. L. R. 972. In the latter decisions the constitutional provision (the same as ours) is referred to as containing the "item veto power of the Governor."

Complaint is made that the appropriation of the surplus to the counties is in indefinite amount. But it is as definite as it could have been made when the law was enacted. It is of all of the surplus, if any, when ascertained, after the setting aside of the fixed reserve fund. Simple arithmetic makes it definite and certain. Unchallenged figures were submitted upon oral argument of the case which show that the sum of $7,595,617.05 is currently in hand for distribution to the counties under the terms of the law.

A strikingly similar case to that in hand and decided under a like constitutional provision is *Black v. Oklahoma Funding Bond Commission,* 193 Okl. 1, 140 P. (2d) 740, 745. The act there attacked provided for the transfer of the surplus fund of the General Reserve Fund to the State Bond Retirement Fund. In upholding the constitutionality of the Act, the Court said:

"Of the fifth ground of attack we observe that the act became law before the end of the fiscal year 1942-43 and therefore the amount of surplus which would accrue in the fund

could not be stated in a definite amount when same was passed. As to the suggestion that the act does not distinctly specify the sums appropriated, we observe that the act devotes the entire surplus, whatever it may be when capable of ascertainment, to the purposes therein specified * * *. In this act the Legislature created a special fund of this surplus which was capable of specific ascertainment by ordinary bookkeeping methods and calculations at a time previous to the time when the law should be first administered."

The following is from 81 C. J. S. States § 164b, p. 1216: "Thus, if the statute making an appropriation distinctly sets aside the whole of a special fund thereby created, and no other funds, for a designated purpose, the appropriation complies sufficiently with the constitutional requirements and is valid * * *. Even where specification of the amount is required, it is sufficient if the amount of the appropriation is ascertainable by a mathematical calculation. It is not essential or vital to an appropriation that it should be for an amount definitely ascertained prior to the appropriation; and an appropriation, the amount of which will be made certain by a mere mathematical computation, if the provisions of the act are carried into effect, sufficiently complies with this requirement."

Point IV made by plaintiff is that the Act violates section 10 of Article X of the constitution, which is:

"The Fiscal year shall commence on the First day of July in each year: Provided, That the General Assembly at its first regular session after the passage of this amendment, shall be authorized and empowered to make appropriations for governmental purposes not exceeding eighteen (18) months, and to make such other changes and provisions in law as may be necessary to effectively make the foregoing provisions operative: * * *."

This was the result of an amendment of the constitution to provide the mechanics for the change of the state's fiscal year from the calendar year to July 1——June 30. It pur-

ports to affect the powers of no General Assembly beyond that immediately succeeding the change. The clause omitted above is effective only if biennial sessions of the General Assembly be adopted, and they have not been adopted. We do not see the relevancy here and think that no discussion is needed.

Point V invokes, again, Section 3 of Article X: "No tax shall be levied except in pursuance of a law which shall distinctly state the object of the same; to which object the tax shall be applied."

We repeat that the law under attack levies no tax. It simply deals with a surplus if and when it shall exist and, again, discussion is unnecessary.

Point VI invokes the due process of law clause of the constitution, section 5, Article I, which it is admitted in the brief is inapplicable if the preceding questions are without merit, as we have found them to be.

Point VII is a contention for attorney's fees if plaintiff should prevail in the action. Our above conclusions render any such question academie and it will not be considered.

The judgment of the court is that the law under attack is constitutional and valid with the elimination of the above emphasized portion thereof, *i. e., "as directed by a majority of the respective legislative delegations, including the senator,"* which is hereby stricken. That portion only is unconstitutional and invalid; the remainder of the law is valid and effective, and injunction with respect to it is denied. The temporary restraining order heretofore issued is dissolved, and the complaint is dismissed.

TAYLOR, LEGGE, and MOSS, JJ., concur.

OXNER, J., dissents.