12682

SHELOR v. PACE, SUPERVISOR, *ET AL.*

(148 S. E., 726)

*Mr. R. T. Jaynes,* for petitioner, 

*Messrs. Hughs & Hughs,* for respondents, 

June 24, 1929.

The opinion of the Court was delivered by MR. JUSTICE COTHRAN.

This is a proceeding in the original jurisdiction of this Court, to enjoin the respondents, fiscal officers of Oconee County, from the issuance and sale of certain bonds, and from the levying and collecting taxes to pay the same. The right to issue the bonds is claimed by the respondents under an Act of the General Assembly passed at the 1929 session. The title of the Act is as follows:

"An Act to Validate Certain Indebtedness of Oconee County; to Authorize the Issuance of Bonds of said County, to Pay Same, and to Provide for the Payment of the Bonds and Interest Thereof."

The constitutionality of the Act is attacked upon the following grounds:

"1st. Because the title does not express the subject of the Act in conformity with Section 17, Article 3 of the Constitution.

"2d. Because the Act provides a mode of apportionment differing from that provided in Section 6 of Article 11 for the three-mill tax, and is, therefore, in violation of it.

"3d. Because Section 6 of Article 11, in providing four sources of revenue for schools, one of which is by county

levy of three mills, is a limitation upon the power of the Legislature to authorize counties to levy additional taxes. This being an additional tax, outside of that limitation, is alleged to be in violation of it."

The pertinent provisions of the Act are:

"Section 1. That the indebtedness existing against the several school districts of Oconee County in the respective amounts as referred to in Section 5 of this Act, and the indebtedness evidenced by note of the County Board of Education, or any renewals thereof, in the sum of about $2,908.15, are hereby declared and determined to have been incurred for educational purposes of Oconee County, and made valid and legal in all respects, and binding obligations upon Oconee County."

Section 2 provides for issuing bonds not exceeding $70,000 for payment of said indebtedness.

Section 3 provides for sale of the bonds.

Section 4 exempts the bonds from taxes.

Section 5 provides that the proceeds from the sale of the bonds shall be disbursed "in payment of said past indebtedness, incurred in and by the several school districts of Oconee County for educational purposes, as shown on a statement made and signed by L. C. Spearers, County Superintendent of Education of Oconee County, being date February 22d, 1929, and on file in the office of Supervisor of said County."

Section 6 provides for levying a tax on "all taxable property in Oconee County" sufficient to pay the bonds and interest according to their terms.

The Act was approved March 15, 1929, and by its terms took effect immediately.

We shall quote quite *in extenso* from the very excellent brief of counsel for the respondents.

From the year 1918 to and including the year 1924, Oconee County had, by legislative authority, levied a county-wide tax for schools, with the provision, however, in the

Act making the levy, that the funds so raised were to be expended for school purposes exclusively in the districts where levied and collected.

For the first year, after the enactment of what has been called the "6-0-1 Law" (Act, March 21, 1924, 33 St. at Large, p. 916), the several school districts of Oconee County endeavored to comply with its provisions each for itself. Because of great difference among the districts in the ratio of school population to assessed valuation of taxable property, many of the schools were amply provided for, while many others were inadequately supplied with funds.

The 6-0-1 Law provided in Section 2 (33 St. at Large, p. 917) that the districts *or counties* should meet the requirements of the Act in order to share its benefits. To remedy the inequality just referred to in Oconee County, the Legislature in 1925 eliminated the provision that the special levy should be used in the district where levied and collected, and provided instead: "The Auditor, with the County Board of Education, shall levy a sufficient tax to meet the salaries of *all* the school teachers in Oconee County for the scholastic year beginning 1925, for the seventh month, and high school teachers for the eighth and ninth months, to be paid out under the State Schedule for Teachers," etc. Act, April 4, 1925, 34 St. at Large, p. 545, § 6. By this provision the burden of meeting the 6-0-1 Law was laid upon the county without regard to district lines, and the provision has been continued to the present. Under the same provision in 1927 (Act, March 11, 1927, 35 St. at Large, p. 627, § 6), the county auditor failed to make a sufficient levy to meet the salaries of "all the teachers in Oconee County," and the deficits arose.

Under the school law in this State, no matter what the source of the school fund, it must be paid out on warrants signed by the trustees of the several school districts. As a consequence, notwithstanding the fund is a county fund, books must be kept by the treasurer in the name of each

district, showing the amount which it may draw upon, and the amount actually drawn. These deficits, therefore, appear on the books as against the several districts, when as a matter of fact in the aggregate they are shortgage in county funds owing to failure of the auditor to make "a sufficient levy to meet the salaries of all the teachers," etc.

The county board, notwithstanding the deficits, continued the schools for the required period to meet the provisions of the 6-0-1 Law.

The Act under investigation was passed to meet that deficit. The petitioner questions its constitutionality in the particulars stated.

Section 5 of Article 11 of the Constitution provides, among other things, "The General Assembly shall provide for a liberal system of free public schools for all children between the ages of six and twenty-one years, and for the division of the Counties into suitable school districts,". etc.

Section 6 of Article 11 provides for the levying and apportionment of a three-mill tax, a poll tax, and a supplemental state tax to pay deficiencies in the school funds. Section 12 of the same article provided for a portion of the revenue from sale of liquors, not then prohibited, to be added to the supplemental tax.

Under these provisions, the General Assembly enacted laws dividing the counties into school districts, imposing and apportioning the three-mill tax, levying the poll tax, and apportioning the dispensary fund. An Act was passed (which remained of force until 1924) making it compulsory that each public school should be open for three months in the year.

With that the Legislature left the counties and school districts pretty much to shift for themselves. No supplemental tax to pay deficiencies was levied. Special local taxes were from time to time voted by the district. Great disproportion in the funds of the various school districts ensued as a natural consequence, and as naturally there followed great

diversity in standard and length of school term. Some schools ran for nine months, while a neighboring school in many instances did not run at all for lack of funds.

In an effort to minimize this inequality, from 1900 to 1924 the Legislature at various times made appropriations for "needy schools." The apportionment of the fund was conditioned upon the levy of a local tax. Many of the districts were backward and failed to make the levy, and the end sought to be accomplished was not realized.

Some of the counties made sporadic efforts in behalf of their schools by making the levy through legislative enactment without the action of the people themselves, notably Oconee, as above noted.

In 1907 the Legislature began a real effort to foster a higher standard of education in rural communities by authorizing state aid for rural high schools established under the provisions of the Act. Act Feb. 19, 1907, 25 St. at Large, p. 518. This law has from time to time been enlarged in its scope, and means provided until the present time, and as a result many excellent standardized high schools exist in the State. These high schools were, however, necessarily confined largely to the thriving common school districts, and the old canker of inequality and lack of standard continued to eat at the vitals of the educational system of the State.

Heeding the mandate of Section 6, Art. 11 of the Constitution, that "the General Assembly shall cause to be levied annually on all the taxable property of the State such a tax * * * as may be necessary to keep the schools open throughout the State for such length of time in each scholastic year as the General Assembly may prescribe," the Legislature enacted the 6-0-1 Law.

This law provides (Section 1) : "The General Assembly shall make sufficient appropriation to pay the salaries of all school teachers in the public schools of the State for six months," etc.

Section 2 provides : "To meet the amount provided for in Section 1 of this Act, there is hereby levied upon all the

taxable property of each county of this State (4) four mills, and in addition thereto the constitutional three-mill tax in each school district, which levy of four (4) mills and the constitutional three-mill tax shall be supplemented by an appropriation from the State in order to provide for the payment of the salaries for the six months terms, as provided for in Section 1: Provided, That each District or County shall be required to provide a sufficient amount to continue for one additional month its school or schools, in order to participate in the revenues provided in this Act."

Sections 3 and 4 (33 St. at Large, pp. 917, 918) provide a schedule of salaries to be paid teachers in accredited high schools and schools not accredited, respectively. An accredited high school must, under general school regulations, run for nine months, so that, in high schools, the local authorities must pay for three months' salaries.

Section 11a (33 St. at Large, p. 921) provides: "That any accredited high school receiving support under this Act shall enroll any eligible high school pupil, the child or ward of any citizen of the State. That any pupil enrolled from outside the high school district shall be liable to no fee or charge," etc.

It is apparent that, while the grammar schools belong to their respective districts, the high schools belong to the county as a whole, without regard to district lines.

The state board of education, in order to promote some regularity in enrollment, promulgated rules which in a measure grouped the common school districts of the counties into high school districts. Some of the counties have had this grouping done by legislative enactment, as, for example, Dillon County, the constitutionality of which was tested in the case of *Powell v. Hargrove*, 136 S. C., 345, 134 S. E., 380. Oconee County did likewise in 1929.

It will be recalled that the 6-0-1 Law provides that the *"districts or counties"* should continue the schools above the six months' period. Operating under this law for the first

year, the Legislature laid upon the districts of Oconee County the burden of meeting the requirements of the 6-0-1 Law, by levying an eight-mill tax to be spent exclusively "in the districts where levied and collected." But with the year 1925 the Legislature made a change, and laid the burden upon the county, directing the auditor with the board of education to levy "a sufficient tax to meet the salaries of *all* the school teachers in Oconee County * * * to be paid out under the State Schedule for Teachers." This provision has from that time forward been included in the county supply bill.

Proceeding under the above provision, the auditor of Oconee County made his levy in 1927, but, it proving insufficient to run the schools as provided by law, the deficit arose at the end of the year, July 1, 1928. As above noted, the law laid upon Oconee County the paying of salaries which would have been paid from county funds if "a sufficient levy" had been made by the auditor. The deficit, though arising from shortage in county funds, was charged on the treasurer's books to the school districts.

The Act under investigation was passed to fund that debt. This is the Act the petitioner alleges is unconstitutional in three particulars. We will dispose of the objections in their order.

It is contended that the title to the Act refers to "certain indebtedness of Oconee County," and that the body of the Act refers to an entirely different matter in providing for payment of "the indebtedness existing against the several school districts of Oconee County."

The error of this contention lies in supposing that the words, "the indebtedness existing against the several school districts," are to be interpreted to mean debts *of* the school districts as distinguished from the county. This error arises from petitioner's attempt to interpret the statute alone, with no reference to other Acts of which it is a part.

From the review of the law had above, it appears that the Legislature had laid upon Oconee County the obligation to

pay the salaries of all teachers in the county for certain months. When the salaries became due, the obligation to pay was the county's; the debt represented by the outstanding salaries was the debt of the county. The mere fact that, under the system of bookkeeping in vogue, the deficits are entered against the respective districts, cannot by any manner of means alter the law by which the obligation to pay was laid upon the county.

The Legislature is presumed to have passed the present Act with the then existing law in mind, and, when the indebtedness validated and its payment provided for was described in the Act as "the indebtedness existing against the several school districts of Oconee County," it used the words in the sense of "the deficits appearing against the several school districts."

The obligation of the county to pay these debts was created by law; and, by necessary implication, laying the obligation on the county relieved the districts of the obligation. Hence, no matter what words were used in the Act to designate the debts, they were in fact still county obligations.

It follows, therefore, that the words, "certain indebtedness of Oconee County," used in the title, relate to the same general subject, and are broad enough to include the debts of the county for school purposes, described in the Act as "existing against the several school districts," when we reflect that the debts were in law and in fact debts of the county. The general subject of the Act is "County Indebtedness." The debts referred to in the body of the Act have been shown to be "county obligations."

The General Assembly having determined that the debts referred to were obligations of the county and valid, we are not at liberty to find the contrary, and it follows that, the debts being county obligations, are properly expressed in the words of the title, "Certain Indebtedness of Oconee County."

It is further objected that the Act violated the provisions of Article 11, § 6, of the Constitution, in providing a method of apportionment different from that provided therein.

Having determined that the obligation, the payment of which is provided for by the Act, is a county obligation, and the funds to be raised are county funds for the payment of that debt, it is a little difficult to see how any apportionment could be made. The Act makes no apportionment so far as we can find, unless the provision that the fund raised from sale of the bonds shall be applied to the payment of the said past indebtedness can be construed as an apportionment.

Admitting that that is an apportionment of the fund, is it violative of Section 6 of Article 11 in the particular pointed out? That Section provides for four sources of revenue for schools: (1) The constitutional three-mill tax on counties and its apportionment among the school districts of the county in *proportion to enrollment.* (2) The poll tax and its use in the *district where levied and collected.* (3) That state supplemental tax to be distributed among the counties in *proportion to the deficiencies* therein existing in the school funds. (4) And, lastly, the local school district tax to be used presumably in the district where collected. Not a word is said about county levies in aid of schools, nor how they shall be apportioned.

The Section provides for four funds, and expressly or by implication provides a restrictive clause directing the manner of apportionment of each. By the very language of the Section it is made clear that these restrictive clauses were intended to be applied each to the particular fund it followed. The provision for the three-mill tax and the provision for its apportionment is all one sentence. The first clause provides for the fund; the second, set off only by a semicolon, provides for its apportionment according to enrollment. The

same is true of the poll tax, the first clause levying the tax, and the second, set off only by a comma, providing for its expenditure in the district where collected. The state supplemental tax likewise—the first clause of the sentence provides for the tax; the second, set off by semicolon, provides for its apportionment among the counties in proportion to the deficiencies. And so the school district tax to be used "for the support of its schools."

It is manifest that the restrictions imposed on the distribution of each fund provided for in this Section cannot be extended to the other funds. What language of the Section can be cited as an intention of the framers of the Constitution to extend the restriction placed on apportionment of the three-mill tax fund to a county fund raised under authority of an entirely different Section of another Article of the Constitution?

The identical question was raised in somewhat similar language in the recent case of *Powell et al. v. Hargrove et al.*, 136 S. C., 345, 134 S. E., 380, in which the Court had under consideration the Act grouping the local districts of Dillon County into high school districts and providing for their support. In that case the Court said, at page 351 of 136 S. C. (134 S. E., 382) : "We do not find anything in the Act which justifies the statement that it interferes with or diminishes the school taxes or the method of apportionment of such taxes as fixed in Section 6 of Article 11. The fact that the common school districts are to remain as formerly established would indicate that such districts will receive hereafter the school taxes which, ordinarily, they will be entitled to receive, and that these taxes will be apportioned as required by that Section and Article of the Constitution. The further fact, that the Act provides the manner whereby the high schools are established thereunder shall be maintained and supported, shows clearly an intention not to interfere with the taxes which would go to the common schools of the common school districts."

And likewise, in the present Act, there is nothing which by any stretch of the imagination could be construed as an interference with the ordinary school fund. By implication the Court held in the case last cited that the county had a right to ·levy a tax additional to that provided for in the cited Section, and to make some reasonable apportionment of the fund.

The petitioner contends that the apportionment provided for by the Act, if ĭt be an apportionment, is arbitrary and in conflict with the general intent of the Constitution, and cites the case of *Murph v. Landrum,* 76 S. C., 21, 56 S. E., 850, in support of the contention.

The facts of that case are not parallel with the present case. In that case some of the counties which had voted out the dispensary were denied their share in the dispensary fund, while counties which had never had a dispensary were allowed to share in it. The Court held the Act unconstitutional in that particular. But in the present case the law requires that all the schools of Oconee County of the same class shall be kept open for the same time. This was presumably done, for public officers are presumed to have done their duty. All districts received the same benefit, but there was money to pay for all the benefit received by some, but not by others. A deficit exists. Had the contingency been foreseen, no doubt by careful mathematics the deficiencies might have been evenly distributed throughout the county among the districts. But, if one district has no deficit by reason of receiving more than its proportionate share of a common fund, and another district by reason thereof has a larger deficit, can a common tax levied to pay the deficit of the latter be said to be arbitrary and on no fair basis of equality? We think not.

All districts received the same benefit. The service to some has been paid for by county fund; service to others has not. A county levy to pay for that service would be fair and equal in contemplation of the Constitution.

This objection cannot be sustained.

It is further objected that the Act violates Article 11, § 6, of the Constitution, in providing for a tax and bonds by the county beyond the limitation of the three-mill tax, the poll tax, and the state tax for paying deficiencies in school funds.

This Court, in the case of *Powell et al. v. Hargrove, supra,* in effect held adversely to the above contention. While the direct question was not presented, the Court did have under consideration an Act which made a provision for levy of a tax outside of the provisions of Section 6 of Article 11, and, after considering thirteen constitutional objections to the Act, the Court concluded: "It is our opinion that there is nothing in the Constitution which forbids the enactment of the Act."

But let us again turn to the Constitution itself.

Section 5 of Article 10 provides: "The corporate authorities of Counties * * * may be vested with power to assess and collect taxes for corporate purposes."

Section 6 of the same Article limits this power of a county or township to taxes or bonds for educational purposes and others specified.

Section 6 of Article 11 nowhere makes any express prohibition against the exercise of that power.

It is the duty of Courts, in construing provisions of the Constitution, to give effect to every separate provision when possible to do so by any reasonable construction.

Sections 5 and 6 of Article 10 can be administered without in any manner encroaching upon Section 6 of Article 11; and so may the latter Section without interfering with the former two.

Again, to say that the framers of the Constitution provided in Article 10 for counties to levy taxes, and then in

Article 11 intended a provision to render the former Article nugatory, would be to convict them of idiocy.

The Legislature, in the absence of constitutional inhibition, inherently had the power, as the representative of the people, to grant counties the authority to levy taxes. Section 6 of Article 10 is a restriction on that power. *Evans v. Beattie, Comptroller General,* 137 S. C., 496, 135 S. E., 538.

The fact that the framers of the Constitution gave expression in Section 5 of Article 10 to a power inherent in the legislative body would seem to argue the intent to emphasize that power, and establish it clear of any implied limitations arising from any other sections.

Section 6 of Article 11 makes no express restrictions upon Section 5 of Article 10, and certainly we cannot say that it does so by implication.

If this Act is to be held unconstitutional on account of the last objection made, the 6-0-1 Law with its four-mill county levy and state appropriation in addition to the three-mill tax, with no provision for apportionment, except as the needs of the schools demand, must likewise be declared in contravention of the same provision. If the one falls, the other must follow. If one stands, the other must survive.

Without multipying cases, it might be remarked in conclusion that, if the Act under investigation is unconstitutional in the particular last named, then the whole fabric upon which the school system of South Carolina rests is unconstitutional, and the only remedy is to junk the whole, amend the Constitution, and begin the slow process of rebuilding from the wreckage.

It has not been shown wherein the Constitution prohibits the enactment of the Act under investigation, and it cannot be declared as in contravention of it.

The judgment of this Court is that the petition for injunction be, and the same is hereby, refused.

MESSRS. JUSTICES BLEASE, STABLER and CARTER and MR. ACTING ASSOCIATE JUSTICE GRAYDON concur.

MR. CHIEF JUSTICE WATTS did not participate.