## 17936

W. E. RUGGLES and Joseph B. Gilchrist, individually and as Representatives of Other Taxpayers and Homeowners in Hanahan Public Service District, Appellants, v. Bennie PADGETT, V. B. Staton, E. E. Mosley, J. D. Kelley and Frank Sineri, individually and as the Hanahan Public Service District, a body politic and corporate; Randell C. Stoney, C. Fletcher Carter, Jr., J. Palmer Gaillard, Jr., Wilson H. Orvin and Clarence W. Legerton, individually and as the Commissioners of Public Works of the City of Charleston, and Daniel R. McLeod, Attorney General of South Carolina, Respondents.

(126 S. E. (2d) 553)

*William L. Shipley, Esq.,* of Moncks Corner, *for Appellants,*

*Messrs. Dennis & Dennis,* of Moncks Corner, and *Sinkler, Gibbs & Simons,* of Charleston, *for Respondent,*

June 21, 1962.

Moss, Justice.

This action is one under the "Uniform Declaratory Judgments Act", Sections 10-2001 *et seq.*, 1952 Code of Laws. The purpose of the action is to determine the constitutionality of certain provisions of two statutes enacted by the General Assembly in 1960, intended to furnish a method for the establishment and financing of a public sewage disposal system for Hanahan Public Service District in Berkeley County. The questions for decision are set out hereafter.

Hanahan Public Service District, hereinafter referred to as the District, was first created by the General Assembly of this State in 1942 by Act No. 784, 42 Stats. 1989. It now

has an area of about five square miles. The District, located adjacent to the North Charleston area of Charleston County, is thickly populated and is a part of metropolitan Charleston. It is basically a residential area with a population of about 7,500 persons. At the present time there are only a few areas of the District served by sewer lines. These existing sewer lines were built in part by private corporations at their own expense, and in part by the District from the proceeds of *ad valorem* taxes. The percentage of residences served by public sewers is small. Sewage for the most part is handled by septic tanks and it is conceded that the nature of the soil is such that in many instances their functioning is poor. It is an admitted fact that on frequent occasions raw sewage flows in open ditches.

The proximity of the District to the water filtration plant of the City of Charleston, operated by the Commissioners of Public Works of that City, hereinafter referred to as the Charleston Commission, makes possible the use of water from the Charleston system by residents of the District. The Charleston system has been extended to the great majority of residences in the District, and those utilizing this service receive water through individual meters. A small portion of the District is served by wooden water mains originally installed by the Federal Government during World War II. This system, which is owned by the District, also obtains its water supply from the Charleston system.

In 1960 the General Assembly enacted into law a statute, Act No. 957 of 1960, 51 Stats. 2239, which makes it possible for the District to construct an extensive sewer system, thereafter designed, to serve substantially all of the District.

The Act provides methods by which the money required for the construction of the system may be raised. Bonds are to be issued payable either solely or primarily from revenues derived by the District from those who will utilize the sewer facilities to be constructed. If general obligation bonds are to be issued, they must be voted, Section 4 of the aforesaid

Act. If bonds payable solely from sewer revenues are issued, they need not be voted.

In order to make certain that revenues will be available to provide debt service on the bonds of the District, it is first specifically empowered to adopt regulations making mandatory the connection to and use of the sewer system.

Section 7 of the Act provides:

"The (Hanahan) commission is expressly empowered to adopt regulations requiring those persons maintaining residences or other buildings on land accessible to the sewage disposal facilities of the district to connect to and utilize such facilities. Such regulations are authorized in the interest of the health of the district, and the commission is expressly authorized to apply to any Court of general jurisdiction for the enforcement of such regulations through the means of mandatory injunction or other remedial process."

The District proposes to avail itself of this authorization by the adoption of a resolution making it mandatory for all to whom sewer service is available to use the same. No exceptions are to be permitted and the appellants here, whose septic tanks are presently functioning properly, must discontinue the use of septic tanks and dispose of all sewage originating on their premises through the means of the public sewer system.

In order to provide an effective means of collecting the sewer charge to be made for service by the sewer system, the District is empowered to enter into a contract with the Charleston Commission under the terms of which the Charleston Commission will collect the sewer charge for the District by combining it with the water charge rendered by the Charleston Commission and thereupon rendering water service only upon the condition that unless the total bill for water and sewer service be paid, water service will be disconnected. The effect of this plan will of course effectively disconnect sewer service, for to use sewer lines, water is required. The record here discloses that following the 1960

enactment, the District and the Charleston Commission have entered into a contract, which as to the Charleston Commission is authorized by Act No. 854 of 1960, 51 Stats. 1987, under which it has been agreed as follows:

1. The District will issue bonds in an amount sufficient to

(a) Pay for the cost of constructing its proposed sewage disposal system; and

(b) Provide $30,000.00 for the purpose of converting the wooden water mains now operated by the District into a conventional water distribution system with customary pipes and meters.

2. The District will convey its reconstructed water system to the Charleston Commission as the primary consideration for the undertaking on the part of the Charleston Commission to collect for the District its sewer charge as a part of a joint bill to be rendered to each water customer of the Charleston Commission under an arrangement by which the Charleston Commission will disconnect water service if the customer fails to pay the combined bill for both water and sewer service.

3. The District will also compensate the Charleston Commisssion for its expenses in billing and collecting its sewer charge.

4. The contract will extend for a period of time not shorter than the life of the last maturing bonds to be issued by the District.

It will be seen by the foregoing that if the plan is consummated, the Charleston Commission will own and operate all water distribution facilities in the District. The District for its part will own and operate all of the sewage disposal facilities in the District. All residences and commercial establishments which are accessible to the public sewage disposal system will be required to connect to and use the public sewer system. All persons utilizing water and sewer service will be required to pay the water charge and the sewer charge as a part of a single combined bill and if such bill is not paid in its entirety, water service will be disconnected.

The contemplated plan has invoked challenges of unconstitutionality on the part of the appellants. These challenges raise the following questions which are disposed of in the order here stated:

1. May the General Assemly by special legislation delegate police powers to the District enabling it to adopt mandatory regulations requiring persons within the District to connect to and use the District's sewer system?

2. Has the General Assembly the power to authorize the District to impose a monthly or quarterly charge upon those whose property is connected with the sewer system for the purpose of maintaining the same and providing funds to pay the principal and interest of bonds issued to finance the cost of the construction of the sewer system?

3. Does the agreement of the Charleston Commission to discontinue water service of those offering to pay for the same simply because such party refuses to pay at the same time the sewer charge imposed by the District deprive such persons of the equal protection of laws guaranteed by the State and Federal Constitutions?

4. Does the Charleston Commission have lawful power to agree to the undertakings assumed by it under the contract with the District?

5. Do the provisions of the act authorizing the District to improve its water system through the proceeds of bonds payable from sewer charges, and thereupon convey such improved systems to the Charleston Commission, deprive the taxpayers of the District of property without due process of law?

In the relatively recent case of *Mills Mill et al. v. Hawkins et al.*, 232 S. C. 515, 103 S. E. (2d) 14, this Court, although divided, held that the General Assembly might, through the means of special legislation, create a special purpose district for the purpose of protecting the public health. Against a challenge that the subject was one for general legislation, and that the special act violated the provisions of

Article III, Section 34, Subdivision 9 of the State Constitution, this Court held:

"One of the most important fields for the exercise of the police power is the protection of public health. Unsanitary conditions within any locality are a matter of vital concern not only to those residing therein but frequently to those in adjacent areas. It was primarily for the protection of the public health that the 1934 Act (a general law) authorized the formation of water and sewer districts. It will be noted that the creation of such a district was not made mandatory by this legislation. Necessarily reserved by the General Assembly was the inherent power to itself create a public corporation providing these facilities if the public health require it. The exercise of this power does not depend upon the will of the land owners and the residents of the area involved. When in a proper case they fail to act, the situation may be corrected by special legislation. It would be difficult in a general law to lay down with any degree of exactness the conditions which in every case would necessitate mandatory action by the State. There are too many varying factors involved."

It will be seen by the foregoing that the rationale of this ruling is that here is a subject as to which no general law can be made applicable, and accordingly, the General Assembly may resolve the problem by special legislation. The twice-argued case, carefully considered, settles this question.

Not specifically challenged in the *Mills Mill case* were the provisions of the Act empowering the governing agency of the special purpose district to adopt regulations making mandatory the use of the public facilities to be provided by the special purpose district. Nevertheless, the majority opinion recognized the existence of those regulations for it observed:

"* * * The apparent apathy on the part of some in this area doubtless led to the provision in the 1955 Act authoriz-

ing the commissioners to compel the residents to use water and sewer facilities. We do not think that the effort to remove the unsanitary conditions prevailing in this territory by special legislation was obnoxious to Article III, Section 34, Subdivision IX of the Constitution. Under the circumstances, there was no general law applicable."

In the case at bar the question is specifically raised. And, while it is properly conceded that the power of the General Assembly is plenary, unless restricted by specific constitutional restraints, and it may require the use of public sewage disposal systems, however, it is contended that this must be done by general law and that a special law requiring property owners in a special purpose district to connect to and utilize a public sewage disposal system violates the constitutional provision that no special law may be enacted when a general law can be made applicable.

Perhaps it is well to note here that the police power ■ permits the construction of sewage disposal systems and the adoption of reasonable regulations requiring property owners to connect therewith. *City of Columbia v. Shaw,* 131 S. C. 464, 127 S. E. 722; *City of Covington v. Sanitation District No. 1,* Ky., 301 S. W. (2d) 885; 17A Am. Jur., Drains and Sewers, Section 53, page 482. It is to be observed also that no hearing need be provided the property owner before the adoption of a regulation of this sort. 17A Am. Jur., Drains and Sewers, Section 58, page 482.

The real argument here stems from a statement made by the late Justice Oxner in disposing of one of the questions raised in the case of *Gaud v. Walker et al.,* 214 S. C. 41, 53 S. E. (2d) 316.

There the holding was that an attempt by the General Assembly, through special legislation, to delegate to Charleston County the power to adopt regulations or ordinances punishable by a fine or imprisonment was unconstitutional on the ground that the General Assembly was pro-

scribed by the provisions of Article III, Section 34, Subdivision 9 of the South Carolina Constitution, from enacting special legislation on this subject. While Justice Oxner's opinion classifies the legislation there involved as an attempt to delegate the police power, it is quite apparent from a reading of the opinion that he was speaking of ordinances involving penal sanctions. The real vice of the legislation there condemned was the fact that it permitted a county agency to define crimes. The reference to this Court's earlier holding in the case of *State v. Hammond,* 66 S. C. 219, 44 S. E. 797, involving a special act making it a misdemeanor to obstruct running streams in certain counties, makes this clear. The situation in the case at bar is not analogous to the situation before the Court in the *Gaud case.* The Gaud decision involved an attempted delegation of the general police power by special enactment; the case here involves the exercise by the General Assembly of police power for a specific and limited purpose. In the *Gaud case* the attempt was to delegate general police powers, including the power to define a crime. In the instant case, the power is specifically limited to the basic object for which the special purpose district was created, namely, the protection of the public health, and is purely a means of implementing that object.

The previously quoted language from the *Mills Mill case* makes it clear that the Court did not intend that its holding in the *Gaud case* should rule out the delegation of the police power for the protection of the public health in a district created for the very purpose of preserving the public health. This is also made clear in the opinion of the late Chief Justice Stukes in the case of *Owens v. Smith et al.,* 216 S. C. 382, 58 S. E. (2d) 332. In that case Justice Stukes distinguished statutes permitting public service districts to require connection to public sewers from cases dealing with other types of special legislation, in the following language:

"* * * They (these statutes) are distinguishable as involving public improvement districts, necessitating special legislation for their creation and operation, which appears

to have been properly assumed in the opinions. Particularly, it is urged that the power delegated by the legislature to the governing bodies of the districts to enforce suitable regulations constitutes a precedent for the present attempt * * *. We do not agree because the requirements of, and provisions for, sewer connections, garbage collection, etc., are purely incidental to the purpose of the local improvement districts. Furthermore, those requirements in the interest of public health and safety are not reasonably comparable * * *."

Here there is no attempt to delegate to any local agency the power to enact penal ordinances. The delegation of power is limited to the adoption of reasonable regulations which are enforceable by application to any Court of competent jurisdiction for the exercise of mandatory injunctions or other remedial orders. The procedure provided by the General Assembly is amply sufficient to protect the property owners against the unreasonable exercise of the power delegated by the General Assembly. If any regulation is adopted which is generally unreasonable it will not be enforced by the Court. Similarly, if any regulation is unreasonable in its application to any particular property owner that owner will have his day in court.

The Court below noted that since it has been definitely settled by this Court that special purpose districts may be created by special acts, it would be inconsistent to hold that the basic purpose of such districts could not be fulfilled through enforcement by appropriate civil measures. With this we agree.

The Court after careful consideration, also agrees that the respondents' position here can be sustained by reason of Section 11 of Article VII of the State Constitution.

It is of course an accepted principle, well established by our decisions, that the provisions of subdivision 9 of Section 34 of Article III have no application to statutes which are specifically authorized by other specific

provisions of the Constitution. Decisions to this effect include *Shelor v. Pace et al.,* 151 S. C. 99, 148 S. E. 726; *Anderson et al. v. Page et al.,* 208 S. C. 146, 37 S. E. (2d) 289; and *Mosely et al. v. Welch et al.,* 209 S. C. 19, 39 S. E. (2d) 133. However, before this result can be obtained it must be clear that the statute challenged as violative of subdivision 9, Section 34, Article III, is in fact specifically authorized by a particular provision of the Constitution.

Section 11 of Article VII provides in substance that the General Assembly may provide such system of township government as it shall think proper in any and all of the counties, and may make special provision for municipal government. The reason for this provision is not altogether clear, but it would appear that those responsible for its inclusion in the present Constitution, did so for the reason that mill villages and other thickly populated areas were growing up in the neighborhood of incorporated cities and towns, and that special provision for the "government" of such areas might be required. The history of Section 11 of Article VII is found in pages 405 *et seq.,* of the Journal of Proceedings, South Carolina Constitutional Convention. The proposal set forth below that there should be a uniform system of township government was rejected. It appears on page 405 as a proposal by Mrs. Otts, as follows:

"Each of the townships of this State, with names and boundaries as now or hereafter established by the General Assembly, shall be a body politic and corporate, and the General Assembly shall provide a uniform system of local government for the same, and require each township to contribute its proportional part of the proper expenses of an efficient County and State Government."

On page 408 Mr. Barton successfully offered a proposal which, although amended, became Section 11. As initially proposed, it read:

"Each of the several townships of this State, with names and boundaries as now established by law, shall constitute a

body politic, but this shall not prevent the General Assembly from organizing other townships or changing the boundaries of those already established, and the General Assembly may provide such a system of township government as it shall think proper."

On motion of Mr. B. R. Tillman, it was amended in two particulars, namely, the first added the words "and corporate" after the word "politic", and the second added to the end of the section the words "in any and all counties." The section was further amended upon motion of Mr. Barker, whose amendment added at the end of the section the following:

"and may make special provision for municipal government and for the protection of chartered rights and powers of municipalities."

In this form it finds its way into the present Constitution, since it was not modified by the Committee on Order, Style and Revision. See pages 715 and 716, Journal of Proceedings, *supra*.

The difficulty comes in ascertaining the true meaning of the term "municipal government." Decisions of this Court clearly show that the term was not intended to apply to incorporated municipalities. Holdings to this effect include *Carolina Grocery Company v. Burnet*, 61 S. C. 205, 39 S. E. 381, 58 L. R. A. 687; *Carroll v. Town of York et al.*, 109 S. C. 1, 95 S. E. 121, 125; *Askew v. Smith et al.*, 126 S. C. 159, 119 S. E. 378; *Battle et al. v. Willcox et al.*, 128 S. C. 500, 122 S. E. 516; and *Reese v. Hinnant et al.*, 187 S. C. 474, 198 S. E. 403. Furthermore, the mere fact that Section 11 constitutes a part of Article VII rather than a part of Article VIII which deals with incorporated municipalities is significant. On the other hand, the term "municipal" used in Section 11 cannot extend in such manner as to provide authorization for special ordinances of a penal nature, such as those stricken down by *Gaud v. Walker, supra*. However, we are satisfied that meas-

ures, not creating crimes or misdemeanors, but which are enacted for the maintenance of the public health in such areas as special purpose districts or townships would be embraced by the term "municipal government" as it is employed in Section 11 of Article VII. Thus, a measure providing for sewage disposal and the regulation of its uses would be embraced by Section 11 of Article VII. However, the function permitted by the Special Act must clearly be an aspect of the type of municipal service rendered by incorporated municipalities, for any enlargement of the term could have the effect of nullifying altogether subdivision 9, Section 34 of Article III. It is the duty of the Court to synchronize and not to nullify provisions in the Constitution. Only in this way can legislation, special in nature, be sustained as not violative of subdivision 9, Section 34, of Article III.

The second question raised by this appeal involves the right of the General Assembly to delegate to the District the right to impose a monthly or quarterly charge upon those whose property is connected with the sewer system for the purpose of providing funds with which to maintain the same and to pay the principal and interest of the bonds issued to finance the cost of the construction of the sewer system. We think it clear that the charge here made is not an assessment. On the contrary, the payment to be made is a charge for service rendered and is similar to a charge for water, gas or electric light service. While this Court has not specifically decided this particular question, it seems clear from reading the cases of *Cathcart v. City of Columbia et al.*, 170 S. C. 362, 170 S. E. 435, and *Roach v. City of Columbia et al.*, 172 S. C. 478, 174 S. E. 461, that the general approval given by this Court to the Revenue Bond Act necessarily included its approval of the several charges for service therein authorized, including charges for sewer service. Decisions elsewhere support this view. *Metropolitan Utilities District v. City of Omaha*, 171 Neb. 609, 107 N. W. (2d) 397; *Schmidt v. Village of Kimberly*, 74 Idaho 48, 256 P. (2d) 515; *Miami Water Company v. City*

*of Miami,* 101 Fla. 506, 134 So. 592, 593; *Ripperger v. City of Grand Rapids,* 338 Mich. 682, 62 N. W. (2d) 585.

To constitute an assessment, it is necessary that there be a lien upon the property subject to the assessment. *Evans et al. v. Beattie et al.,* 137 S. C. 496, 135 S. E. 538; *Briggs v. Greenville County et al.,* 137 S. C. 288, 135 S. E. 153; *Rutledge v. Greater Greenville Sewer District et al.,* 139 S. C. 188, 137 S. E. 597.

It follows that since the charge here is one for a service rendered, and does not constitute an assessment, no hearing need be provided for the property owner, preliminary to the imposition of the charge.

As noted by the respondents, countless cities and towns in South Carolina have availed themselves of the authorization of the Revenue Bond Act, Section 59-364 of the 1952 Code, providing for the combining of water and sewer systems into a single system and afterwards issuing bonds payable from the revenues of such combined single system to pay for water or sewer improvements. Other combinations are permitted by this Section of the Code. In *Doyle v. Rosen et al.,* 229 S. C. 67, 91 S. E. (2d) 887, we upheld action by the City of Georgetown in combining its water, sewer and electrical distribution systems. The reason for the combining of water and sewer systems into a single system is apparent. It is both difficult and costly to disconnect a sewer lateral. It is a relatively simple thing to cut off a water meter. But it is argued that since the District will not operate its own water system it is powerless to make a contract with the Charleston Commission whereby the Charleston Commission will undertake to act for the District and bill for sewer service as a part of a combined bill for water and sewer service, under the condition that if the total combined bill is not paid water service will be forthwith disconnected, thus effectively depriving the delinquent of both water and sewer service.

This question has been raised frequently in other jurisdictions, and with the single exception of the State of Alabama,

*McMahon v. Baumhauer et al.,* 234 Ala. 482, 175 So. 299, it has been uniformly held that the failure to pay a sewer charge makes it possible to disconnect water service.

Perhaps the most recent case, and one quite similar to the case at bar, is that of *Metropolitan Utilities District v. City of Omaha, supra.* In that case, the question was the right of the utility district which operated the water system to collect and remit to the City of Omaha sewer charges imposed by the City. The City fixed the rates for the use of its sewer system and the District agreed to collect them with a provision similar to that here, that if the property owner should fail to pay the combined charge, water service would be disconnected. The Nebraska Court held that there was no good reason why the Legislature, in the exercise of its plenary power to regulate and control municipal corporations could not grant authority to the District to collect the sewer charge for the City. It based its holding upon an earlier case in which it had been held that the provision of a city ordinance for shutting off water furnished by the city to the premises of the customer failing to pay sewer service charges was not unconstitutional as depriving the property owner of his property without due process of law, noting that where water and sewer services were interlocked, neither could be effective without the other. A similar result obtained in the Florida case of *State v. City of Miami,* 157 Fla. 726, 27 So. (2d) 118, in which the Florida Court upheld an ordinance of the City which provided that if charges for the use of the sewer system were not paid, the City might cut off water to the premises for nonpayment of the sewer charges. The Michigan case of *Ripperger v. City of Grand Rapids, supra,* also upheld an ordinance which provided that water could be cut off if the customer failed to pay for sewage disposal charges.

A situation closely similar to that existing here is found in the arrangement involving the adjoining cities of Chattanooga, Tennessee, and Rossville, Georgia. Both cities are furnished water by a private company, the City Water Com-

pany of Chattanooga. In the case of *Liner v. City of Rossville et al.,* 213 Ga. 756, 101 S. E. (2d) 753, the Supreme Court of Georgia upheld the contract between the City of Rossville, the City of Chattanooga, and the City Water Company of Chattanooga, under which the City Water Company of Chattanooga agreed that it would bill and collect sewer charges along with its own water charges from property owners and that it would disconnect water service if the customer failed to pay both water and sewer charges. The Tennessee Court reached a similar conclusion in the case of *Patterson v. City of Chattanooga,* 192 Tenn. 267, 241 S. W. (2d) 291, a case involving the same provision of the contract.

In the Virginia case of *Farquhar v. Board of Supervisors of Fairfax County et al.,* 196 Va. 54, 82 S. E. (2d) 577, the Virginia Supreme Court of Appeals reached a similar result. There again it was contended that the enforcement of sewer connections and the collection of sewer charges would deprive the landowner of his property without due process of law because of the requirement that if charges for the use of the sewer system were not paid, water service would be disconnected. The Virginia Court noted that these provisions were necessary to insure the functioning of the sanitary sewer system which was constructed and operated by an agency of the state and organized for the preservation of the public good. It held that the plan was constitutional.

Other cases analogous are *City of Covington v. Sanitation District No. 1, supra,* and *City of Lawrence v. Robb,* 175 Kan. 495, 265 P. (2d) 317.

On the basis of the foregoing, we conclude that the plan here attacked, which contemplates that the Charleston Commission will cut off water service to any of its customers who fail to pay the combined bill for both water and sewer service is a valid exercise of the inherent police power of the State.

In the statement of facts previously made, we have noted that in its 1960 legislation the General Assembly passed a

special act authorizing the Charleston Commission to enter into a contract here challenged. It is contended by the appellants that the power thus granted to the Charleston Commission is invalid inasmuch as Section 1 of Article VIII requires that all powers granted to municipal corporations be applicable to all municipal corporations within the same general classification.

This Court has held in two recent decisions, *Sossamon v. Greater Gaffney Metropolitan Utilities Area et al.,* 236 S. C. 173, 113 S. E. (2d) 534, and *Watson et al. v. Pulliam et al.,* 239 S. C. 186, 121 S. E. (2d) 910, that Section 1 of Article VIII prohibits the General Assembly from imposing burdens on one municipal corporation not applicable to all within the class.

Section 1 of Article VIII provides that the powers of each class of municipal corporations shall be defined so that no such corporation shall have any powers other than all corporations of the same class.

The respondents contend that the special legislation here involved comes within the exception to the rule noted in the case of *City of Spartanburg v. Blalock et al.,* 223 S. C. 252, 75 S. E. (2d) 361, where the Court noted that it had been consistently held that legislation authorizing special financing does not come within the constitutional inhibition mentioned. However, we do not find it necessary to pass specifically upon this contention, for the reason that the action of the Charleston Commission can be properly sustained under the doctrine of implied powers which has had the sanction and approval of this Court in the case of *Simons v. City Council of Charleston et al.,* 181 S. C. 353, 187 S. E. 545. In that case the Charleston Commission sought, without statutory authorization, to additionally secure bonds of the City of Charleston by a pledge of net revenues derived from the operation of its water system. The challenge was made that this could not be done without specific statutory authorization therefor. The Court

did not agree. It noted that a municipal corporation in its private proprietary and essentially business or commercial aspect, acts as a property owner and may exercise its business powers very much in the same manner as a private individual or corporation. On this basis it sustained the action of the Charleston Commission. Our Court recognized this principle in the *Sossamon case,* citing with approval from the earlier case of *Green et al. v. City of Rock Hill et al.,* 149 S. C. 234, 147 S. E. 346, as follows:

"* * * While in this state it is settled that the operation of water works by a municipality is so far governmental in character as to absolve the corporation from liability sounding in tort * * *, there can be no doubt that in the fiscal aspect thereof the operation and maintenance of such utility partake largely of the nature of a commercial or business enterprise. * * *"

Accordingly, the only question that can arise would be whether the exercise of the undertakings by the Charleston Commission would be *ultra vires.* It would seem clear that the proper functioning of a sewer system is extremely desirable to any utility furnishing water in the same area. The absence of the sewer system would have a decided tendency to limit the number of persons who might live within the area and thus become water customers. It is to be noted here that the Hanahan District is in close proximity to the Charleston Water System and thus from a commercial or proprietary standpoint, it is only reasonable to suppose that the Charleston Commission would wish to make its water available and generally used in order to make an appropriate profit therefrom. Thus its act in assisting its neighbor, promotes its own business enterprise, and to that end, action is justified under the rationale of the decisions above cited.

Finally, it is contended that the District may not impose a sewer charge which would pay that portion of its bond issue designed to improve its antiquated water system. The record shows that the small antiquated system of the District does not meet the standards of the

surrounding Charleston system. The Charleston system serves almost all of the entire area of the District. It is therefore not unreasonable that the Charleston system should take over the small remaining portion. Bonds in an amount sufficient to put the antiquated system in good condition are proposed to be issued to the extent of $30,000.00. When the system is thus improved, it is to be conveyed by the District to the Charleston Commission. The consideration prompting this conveyance is the agreement of the Charleston Commission to undertake the important function of collecting the District sewer charge. This consideration is reasonable and since the power has been specifically given to the District to enter into this transaction by legislation, no real question exists. The situation is entirely analogous with that involved in the case of *Babb v. Green et al.*, 222 S. C. 534, 73 S. E. (2d) 699, in which this Court upheld action by the Town Council of the Town of Fountain Inn, in Greenville County, in conveying its water system for a relatively nominal consideration, to the Mauldin-Simpsonville-Fountain Inn Water District. Against a challenge that the taxpayer was deprived of his property without process of law, the Court noted that the basic plan was clearly in the interest of the taxpayers of the City.

All exceptions are overruled, and the Order of the Circuit Court is affirmed.

Affirmed.

TAYLOR, C. J., and LEWIS, BUSSEY and BRAILSFORD, JJ., concur.